# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SEAN ZHOU, derivatively on behalf of HD SUPPLY HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH J. DEANGELO; EVAN J. LEVITT; KATHLEEN J. AFFELDT; BETSY S. ATKINS; PETER A. DORSMAN; PATRICK R. MCNAMEE; CHARLES W. PEFFER; JAMES A. RUBRIGHT; and LAUREN TAYLOR WOLFE, <br><br> Defendants, <br><br> -and- <br><br> HD SUPPLY HOLDINGS, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

By and through his undersigned counsel, Plaintiff Sean Zhou ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant HD Supply Holdings, Inc. ("HD Supply" or the "Company") and against certain current and former officers and directors of the Company for issuing a false and misleading proxy statement in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by HD Supply and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on HD Supply's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *City of Hollywood Police Officers' Retirement System v. HD Supply Holdings, Inc. et al.*, Case No. 1:17-cv-02587-ELR (N.D. Ga.) (the

1

"Securities Class Action"); and (e) review of other publicly available information concerning HD Supply and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.     HD Supply is one of the largest industrial distributors in North America.  The Company provides a broad range of products and services to approximately 500,000 customers in maintenance, repair, and operations ("MRO"), water infrastructure, and residential and non-residential construction sectors.

2.     The Company's leading businesses include HD Supply Facilities Maintenance ("FM"), HD Supply Waterworks ("Waterworks"), and HD Supply Construction & Industrial – White Cap.

3.     Since at least November 9, 2016 through the present (the "Relevant Period"), the Individual Defendants caused HD Supply to issue false and misleading statements concerning the Company's business, operations, and financial prospects, including misrepresentations regarding operating leverage and supply chain corrective actions.  Specifically, the Individual Defendants caused the Company to make improper statements and/or failed to disclose that: (i) the Company's growth and operating leverage targets for full year 2017 were unattainable; (ii) the operational recovery of the Company's FM supply chain was

not progressing as expected and would require substantial additional investment; (iii) the Company was preparing to sell its Waterworks segment; and (iv) as a result of the foregoing, the Individual Defendants' statements during the Relevant Period about HD Supply's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

4.      As a result of the foregoing false and misleading statements issued by the Individual Defendants, the Company's stock price rose dramatically, reaching artificially inflated prices as high as $44.24 per share during the Relevant Period.

5.      While the Company's stock price was artificially inflated, certain Individual Defendants exploited their positions as corporate fiduciaries of HD Supply and sold their personal stock holdings for millions of dollars in insider profits, while in possession of material, adverse, and non-public information regarding the Company's operations and business prospects.  In particular, in the months just before the truth about the Company's operations was revealed, HD Supply's Chairman, Chief Executive Officer ("CEO") and President, Joseph J. DeAngelo ("DeAngelo"), sold over 1.3 million shares of the Company's stock (representing approximately 80% of his ownership in HD Supply) for proceeds of over $53 million.

6.     On June 6, 2017, the truth about the Company's growth and operating leverage targets began to emerge.  On that date, HD Supply issued a press release announcing the Company's first quarter 2017 financial results, revealing that: (i) the Company's earnings had missed analyst estimates; (ii) the FM segment's supply chain operations would require increased capital investment in order to recover; and (iii) the Company had entered into an agreement to sell its Waterworks segment.  On the same day, HD Supply hosted a conference call with investors and analysts, confirming these revelations.

7.     The disclosures in the June 6, 2017 press release and conference call sharply contradicted the statements made by the Company's senior officers on the two previous earnings calls.  During those calls, Defendant DeAngelo and other executives had assured investors and analysts that the Company's supply chain issues had already been addressed and that HD Supply would see increased operating leverage and growth in 2017 due to reduced costs in the FM sector.

8.     The market reacted negatively to these revelations, and HD Supply's stock price declined approximately 17.5% in one day, falling $7.24 per share to close at $34.03 per share on June 6, 2017, resulting in a loss of approximately $1.4 billion in market capitalization.

9.     Since the revelations on June 6, 2017, HD Supply's stock price has continued to decline.  Despite the disappointing results, and despite their improper sales of large amounts of the Company's stock for their own profit, HD Supply's senior officers continue to be rewarded with lavish compensation, and have personally profited at the expense of the Company and its shareholders.

10.    HD Supply's Board of Directors (the "Board") has not, and will not, commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to HD Supply for authorizing or failing to correct the improper statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate HD Supply's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to HD Supply.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over all claims under 28 U.S.C. § 1331 in that the Complaint states a federal question.   The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C.

§ 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.    The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in Georgia, or is an individual who has sufficient minimum contacts with Georgia so as to render the exercise of jurisdiction by the Georgia courts permissible under traditional notions of fair play and substantial justice.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District.

14.    In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A.    Plaintiff

15.    Plaintiff Sean Zhou has been a HD Supply shareholder since November 2013 and is, and at all relevant times has been, a holder of HD Supply common stock.

**B.     Nominal Defendant**

16.     Nominal Defendant HD Supply is incorporated in Delaware, and its principal executive offices are located at 3100 Cumberland Boulevard, Suite 1480, Atlanta, Georgia 30339.   The Company's common stock is traded on the NASDAQ Stock Market under the ticker symbol "HDS."   The Company has more than 202 million shares outstanding.

**C.     Individual Defendants**

17.     Defendant DeAngelo has been HD Supply's President and CEO since January 2005, a member of the Company's Board since August 2007, and the Chairman of the Board since March 2015.   DeAngelo is a defendant in the Securities Class Action.   He received $5,305,241 in total compensation from HD Supply in 2016.   During the Relevant Period, while in possession of material, non-public information, DeAngelo sold at least 1.3 million personally held shares of HD Supply stock at artificially inflated prices for proceeds of more than $53 million.

18.     Defendant Evan J. Levitt ("Levitt") has been the Chief Financial Officer ("CFO") and Senior Vice President of the Company since December 2013, and has also been Chief Administrative Officer since January 2017.   Levitt is a

defendant in the Securities Class Action. Levitt received $2,180,906 in total compensation from HD Supply in 2016.

19.   Defendant Kathleen J. Affeldt ("Affeldt") has been a member of HD Supply's Board since January 2014. During the Relevant Period, Affeldt was the Chair of the Compensation Committee. Affeldt received $224,991 in total compensation from HD Supply in 2016.

20.   Defendant Betsy S. Atkins ("Atkins") has been a member of HD Supply's Board since August 2013, and has been Lead Independent Director since January 2016. During the Relevant Period, Atkins was Chair of the Nominating and Governance Committee and a member of the Compensation Committee. Atkins received $229,991 in total compensation from HD Supply in 2016. During the Relevant Period, while in possession of material, non-public information, Atkins sold at least 3,096 personally held shares of HD Supply stock at artificially inflated prices for proceeds of more than $125,388.

21.   Defendant Peter A. Dorsman ("Dorsman") has been a member of HD Supply's Board since March 2017. During the Relevant Period, Dorsman was a member of the Compensation Committee.

22.   Defendant Patrick R. McNamee ("McNamee") has been a member of HD Supply's Board since August 2013. During the Relevant Period, McNamee

was a member of the Audit Committee and the Compensation Committee. McNamee received $227,491 in total compensation from HD Supply in 2016.

23.    Defendant Charles W. Peffer ("Peffer") has been a member of HD Supply's Board since January 2013.  During the Relevant Period, Peffer was the Chair of the Audit Committee.  Peffer received $229,991 in total compensation from HD Supply in 2016.

24.    Defendant James A. Rubright ("Rubright") has been a member of HD Supply's Board since October 2014.  During the Relevant Period, Rubright was a member of the Audit Committee.  Rubright received $347,486 in total compensation from HD Supply in 2016.

25.    Defendant Lauren Taylor Wolfe ("Wolfe") has been a member of HD Supply's Board since March 2017.  During the Relevant Period, Wolfe was a member of the Audit Committee.

### D.    Non-Party Director

26.    Lionel L. Nowell, III ("Nowell") is not a defendant in this action. Nowell was appointed to HD Supply's Board in May 2017.  Pursuant to HD Supply's Board of Directors Compensation Policy, described in HD Supply's proxy statement for its 2017 annual meeting of stockholders, Nowell is entitled to annual cash and equity compensation of over $200,000.

9

27.     Defendants identified in ¶¶ 17-25 are sometimes referred to herein as the "Individual Defendants."

28.     Defendants DeAngelo, Affeldt, Atkins, Dorsman, McNamee, Peffer, Rubright, and Wolfe are sometimes referred to herein as the "Director Defendants."

29.     Defendants McNamee, Peffer, Rubright, and Wolfe are sometimes referred to herein as the "Audit Committee Defendants."

30.     Defendants DeAngelo and Atkins are sometimes referred to herein as the "Insider Selling Defendants."

## BACKGROUND ON HD SUPPLY

31.     HD Supply was founded in 1974 as Maintenance Warehouse, an industrial distributor of MRO materials.  In 1997, Home Depot acquired Maintenance Warehouse, which was renamed HD Supply after a merger with Hughes Supply in 2006.  Home Depot sold HD Supply in 2007 to a buying consortium of Carlyle, Bain and Clayton Dubilier & Rice.  In 2013, HD Supply began trading as a public company.

32.     The Company's FM segment distributes MRO products to healthcare and government facilities, as well as to multifamily, hospitality, and commercial properties.

33.     The Company's Waterworks segment is largest distributor of water, sewer, storm, and fire protection products in the United States.   Waterworks provides services including fusible piping, water and sewer line installation, construction of storm water retention systems and wastewater treatment plants, and fire protection equipment.

34.     The Company's Construction & Industrial segment provides specialty hardware, tools, and materials, including home improvement products and building materials, to medium-to-large contractors.

35.     In early 2016, the FM segment's supply chain experienced inventory forecasting issues that led to inadequate ordering of inventory.   HD Supply's management took corrective action, which then resulted in excessive inventory, causing overcapacity at the Company's distribution centers.   The Company's management assured investors and analysts that they were causing HD Supply to take appropriate remedial action to process the inventory and rebalance the supply chain.

**THE INDIVIDUAL DEFENDANTS CAUSED THE DISSEMINATION OF IMPROPER STATEMENTS**

36.     On November 9, 2016, the Individual Defendants caused HD Supply to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's preliminary financial and operating results for the third

quarter of fiscal 2016, ended October 30, 2016.  For the quarter, HD Supply reported preliminary net income in the range of $59 million – $60 million, or $0.29 – $0.30 per diluted share, on net sales of approximately $2.008 billion, an expected increase of 3.4% compared to the third quarter of 2015.

37.    On the same day, Defendants DeAngelo and Levitt delivered a presentation for HD Supply at the Robert W. Baird Global Industrial Conference in Chicago, Illinois.  As shown on the slide show filed on Form 8-K with the SEC, DeAngelo and Levitt reported the Company's third quarter 2016 financial results, emphasizing the Company's "Facilities Maintenance Supply Chain…On Track" and "Focused on Controllable Execution," with expected results of 300 basis points of sales growth higher than market and operating leverage growth in the range of 1.5 to 2.0 times.  In particular, during his presentation at the conference, Defendant DeAngelo made the following statements:[1]

> To give you a quick update on our execution, ***our work in facilities maintenance on our supply chain is on track. We're perfectly positioned to enter 2017 and deliver on our commitments of 300 basis points more than market, 1.5 times operating leverage, and 75% cash generation.***
>
> We're cautiously optimistic relative to the markets we participate in. There are some mixed signals out there, but at the moment, we're

---

[1] Unless otherwise noted, any emphasis in the quoted material in this Complaint has been added by Plaintiff.

optimistic relative to the way we will enter 2017. We are focused 100% on controllable execution, so consistently delivering 300 basis points more than the market, 1.5 times to 2 times operating leverage, and 75% cash flow conversion from EBITDA. And it's all based on our culture of bringing in the best talent and making that talent better every day for our customers, associates, and our shareholders.

\*       \*       \*

***The supply chain execution to date has tracked exactly where we thought it would be, so we're essentially through the balance of the supply chain rebalancing relative to inventory positioning***, and we're shifting our focus into optimizing within the four walls of our DCs, so ***we feel very comfortable that coming into next year, we will consistently be able to deliver in every year forward that 300 basis points of market outgrowth and at a 1.5 operating leverage***.

38.    On December 6, 2016, the Individual Defendants caused HD Supply to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the third quarter of fiscal 2016, ended October 30, 2016.  For the quarter, HD Supply reported net income of $60 million, or $0.30 per diluted share, on net sales of $2.0 billion, an increase of 3.4% compared to the third quarter of 2015.  The press release stated in relevant part:

> "We delivered growth and solid cash conversion in the third quarter and are focused on building momentum for the 2017 selling season," stated Joe DeAngelo, Chairman and CEO of HD Supply.
>
> Gross profit increased $35 million, or 5.4 percent, to $683 million for the third quarter of fiscal 2016 as compared to $648 million for the third quarter of fiscal 2015. Gross profit was 34.0 percent of Net sales

for the third quarter of fiscal 2016, up approximately 60 basis points from 33.4 percent of Net sales for third quarter of fiscal of 2015.

Operating income increased $4 million, or 1.8 percent, to $231 million for the third quarter of fiscal 2016 as compared to $227 million for the third quarter of fiscal 2015. Operating income as a percentage of Net sales was 11.5 percent for the third quarter of fiscal 2016, decreasing approximately 20 basis points from 11.7 percent for the third quarter of fiscal 2015.

Net income decreased $190 million, or 76.0 percent, to $60 million for the third quarter of fiscal 2016 as compared to $250 million for the third quarter of fiscal 2015. Net income per diluted share decreased $0.94 or 75.8 percent to $0.30 for the third quarter of fiscal 2016, as compared to $1.24 for the third quarter of fiscal 2015. Net income in the third quarter of fiscal 2016 included a $59 million loss incurred as a result of the extinguishment of debt. Net income in the third quarter of fiscal 2015 included a $186 million pre-tax gain from the sale of the Power Solutions business and an $100 million loss incurred as a result of the extinguishment of debt.

*     *     *

**Business Unit Performance**

**Facilities Maintenance**

Net sales increased $8 million, or 1.1 percent, to $724 million for the third quarter of fiscal 2016, as compared to $716 million for the third quarter of fiscal 2015. Adjusted EBITDA decreased $9 million, or 6.0 percent, to $140 million for the third quarter of fiscal 2016 as compared to $149 million for the third quarter of fiscal 2015. Adjusted EBITDA as a percentage of Net sales was 19.3 percent for the third quarter of fiscal 2016, decreasing approximately 150 basis points from 20.8 percent for the third quarter of fiscal 2015.

**Waterworks**

Net sales increased $28 million, or 4.0 percent, to $733 million for the third quarter of fiscal 2016, as compared to $705 million for the third quarter of fiscal 2015. Adjusted EBITDA increased $4 million, or 5.7 percent, to $74 million for the third quarter of fiscal 2016 as compared to $70 million for the third quarter of fiscal 2015. Adjusted EBITDA as a percentage of Net sales was 10.1 percent for the third quarter of fiscal 2016, up approximately 20 basis points from 9.9 percent for the third quarter of fiscal 2015.

**Construction & Industrial — White Cap**

Net sales increased $27 million, or 5.7 percent, to $499 million for the third quarter of fiscal 2016, as compared to $472 million for the third quarter of fiscal 2015. Adjusted EBITDA increased $9 million, or 17.6 percent, to $60 million for the third quarter of fiscal 2016 as compared to $51 million for the third quarter of fiscal 2015. Adjusted EBITDA as a percentage of Net sales was 12.0 percent for the third quarter of fiscal 2016, up approximately 120 basis points from 10.8 percent for the third quarter of fiscal 2015.

39.    That same day, the Company hosted a conference call with analysts and investors during which Defendant DeAngelo reaffirmed HD Supply's "commitment to generating 300 basis points of sales growth in excess of market and 1.5 times operating leverage for the full year of FY17." In particular, Defendant DeAngelo also made the following statements:

> *Our third-quarter performance delivered growth and solid cash flow conversion, while we made excellent progress on our supply chain actions and improvements in Facilities Maintenance*.

*     *     *

*[T]he operational recovery of our Facilities Maintenance supply chain continues to make exciting daily progress, and the teams are executing at or ahead of expectations*. As a reminder, our Facilities Maintenance supply chain issue began with the under-ordering of inventory in advance of the 2016 spring and summer selling seasons. Corrective action was taken to adjust ordering in 2016, which resulted in an atypical amount of inventory, primarily long-lead import inventory, arriving at our distribution centers during the busy summer selling season.

As a result, our distribution center resources were stretched beyond ordinary course capacity, and it has taken the better part of 2016 to process the inventory into our network and rebalance it throughout the country to perfectly meet our local customer promise. Executive leadership continues to drive daily execution calls with our extended supply chain teams to track key operational metrics, gauge daily progress, and prioritize actions to drive coordinated performance across the country. *The key daily metrics have seen strong recovery since the last earnings call, and are now operating at or better than the first-quarter 2016 levels*.

*As Facilities Maintenance supply chain recovery moves behind us, we expect to see a commercial recovery in three phases.* First, by having product fully available for sale when and where the customer needs it, we expect to be positioned to grow with the MRO market, as our customers place unplanned purchases with us. Second, as we deliver consistently on our customer promise, we expect to regain customer loyalty and execute our growth plays to earn growth in excess of market within the MRO business.

Third, we will see our property improvement business return to growth. Given the sales lead time and larger ticket purchase decisions, we expect our property improvement business to recover on a lagged basis relative to MRO execution.

*       *       *

*We reaffirm our commitment to generating 300 basis points of sales growth in excess of market and 1.5 times operating leverage for the*

*full year of FY17*. We believe we are currently in the first phase of commercial recovery and expect to see the MRO business recover to market growth levels in the fourth quarter. We are confident in our execution and excited about our building momentum, which provides a line of sight to reestablish sales growth in excess of market as we enter the 2017 selling season.

*I now want to comment on the disciplined and strategic investments we are simultaneously making in Facilities Maintenance. This quarter we made good progress on standardizing, optimizing, and automating our existing processes*. These cross-functional projects are on track, and we expect to complete these projects by the end of 2017.

We continue to invest in the supply chain, and believe we have significant opportunities to extend productivity and operational excellence across the supply chain. As I mentioned previously, our execution will focus on improving the customer experience, ultimately delivering profitable growth, cost productivity, and cash.

40.    In response to these statements, analysts upgraded their ratings and price targets on HD Supply's stock.  For example, in a report issued by Morgan Stanley on December 19, 2016, the Company's shares were upgraded and the price target was increased to $47 from $44, with the analysts explaining:

We believe that HDS is exceptionally well positioned as we enter 2017 for three reasons: 1) HDS has the highest US sales exposure at 98% and thus the highest GAAP tax rate. As such, the company would be a major beneficiary of US tax reform. 2) HDS has two business lines – Waterworks and White Cap - that we view as significant beneficiaries from infrastructure stimulus, given leverage to water, wastewater and non-building construction. 3) *We believe that the recent inventory and fulfillment issues that have crimped organic growth and operating leverage in its Facilities Management*

17

***segment will become less of a factor and hence drive organic revenue acceleration*** from +2.8% in 2H16 to +3.3% in 2017.

41.    On March 14, 2017, the Individual Defendants caused HD Supply to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the fourth quarter and full year fiscal 2016, ended January 29, 2017.  For the quarter, HD Supply reported net income of $52 million, or $0.26 per diluted share, on net sales of $1.634 billion, an increase of 3.2% compared to the fourth quarter of 2015.  The press release stated in relevant part:

> "***I am pleased with the team's performance in fiscal 2016. We delivered growth and solid cash flow while simultaneously transforming our business capabilities,*** *stated Joe DeAngelo, Chairman and CEO of HD Supply. "**We are intensely focused on controllable execution that contributes to the success of our customers and I am encouraged with our momentum in 2017***."

> Gross profit increased $143 million, or 6.0 percent, to $2,532 million for the full-year fiscal 2016 as compared to $2,389 million for the full-year fiscal 2015. Gross profit was 34.0 percent of Net sales for the full-year fiscal 2016, up approximately 50 basis points from 33.5 percent of Net sales for the full-year fiscal 2015.

> Operating income increased $54 million, or 7.3 percent, to $791 million for the full-year fiscal 2016 as compared to $737 million for the full-year fiscal 2015. Operating income as a percentage of Net sales was 10.6% percent for the full-year fiscal 2016, up approximately 30 basis points from 10.3 percent for the full-year fiscal 2015.

> Net income decreased $1,276 million, to $196 million for the full-year fiscal 2016 as compared to $1,472 million for the full-year fiscal

2015. Net income per diluted share decreased $6.34 to $0.97 for the full-year fiscal 2016 as compared to $7.31 for the full-year fiscal 2015. Net income for full-year fiscal 2015 included a $1,007 million tax benefit resulting from the reversal of the deferred tax asset valuation allowance, a $189 million non-cash tax credit from the settlement of an IRS audit, and a $186 million pre-tax gain on the sale of the Power Solutions business unit.

\*      \*      \*

**Business Unit Performance**

**Facilities Maintenance**

*Full-Year Results*

Net sales increased $72 million, or 2.7 percent, to $2,762 million in the full-year fiscal 2016, as compared to $2,690 million for the full-year fiscal 2015. Adjusted EBITDA decreased $6 million, or 1.1 percent, to $523 million for the full-year fiscal 2016 as compared to $529 million for the full-year fiscal 2015. Adjusted EBITDA as a percentage of Net sales was 18.9 percent for the full-year fiscal 2016, down approximately 80 basis points from 19.7 percent for the full-year fiscal 2015.

*Fourth Quarter Results*

Net sales increased $14 million, or 2.3 percent, to $620 million in the fourth quarter of fiscal 2016, as compared to $606 million for the fourth quarter of fiscal 2015. Adjusted EBITDA decreased $4 million, or 3.9 percent, to $98 million for the fourth quarter of fiscal 2016 as compared to $102 million for the fourth quarter of fiscal 2015. Adjusted EBITDA as a percentage of Net sales was 15.8 percent for the fourth quarter of fiscal 2016, down approximately 100 basis points from 16.8 percent for the fourth quarter of fiscal 2015.

**Waterworks**

*Full-Year Results*

Net sales increased $112 million, or 4.5 percent, to $2,622 million in the full-year fiscal 2016, as compared to $2,510 million for the full-year fiscal 2016. Adjusted EBITDA increased $12 million, or 5.4 percent, to $234 million for the full-year fiscal 2015 as compared to $222 million for the full-year fiscal 2015. Adjusted EBITDA as a percentage of Net sales was 8.9 percent for the full-year fiscal 2016, up approximately 10 basis points from 8.8 percent for the full-year fiscal 2015.

*Fourth Quarter Results*

Net sales increased $18 million, or 3.4 percent, to $551 million in the fourth quarter of fiscal 2016, as compared to $533 million for the fourth quarter of fiscal 2015. Adjusted EBITDA increased $1 million, or 2.4 percent, to $42 million for the fourth quarter of fiscal 2016 as compared to $41 million for the fourth quarter of fiscal 2015. Adjusted EBITDA as a percentage of Net sales was 7.6 percent for the fourth quarter of fiscal 2016, down approximately 10 basis points from 7.7 percent for the fourth quarter of fiscal 2015.

\*       \*       \*

For fiscal year 2017, the company estimates end market growth of approximately 2-3 percent. ***The company estimates 300 basis points of sales growth in excess of the estimated market growth and operating leverage in the range of 1.5 to 2.0 times for fiscal year 2017***.

42.   Also on March 14, 2017, the Individual Defendants caused the Company to file an annual report on Form 10-K with the SEC, for fiscal year ended January 29, 2017 (the "2016 10-K"). The 2016 10-K, which was signed by Defendants DeAngelo, Levitt, Affeldt, Atkins, Dorsman, McNamee, Peffer,

Rubright, and Wolfe, emphasized opportunities for growth and returns to shareholders, and included the following statements:

> HD Supply is one of the largest industrial distributors in North America. We believe we have leading positions in the three distinct market sectors in which we specialize: Maintenance, Repair & Operations ("MRO"); Infrastructure; and Specialty Construction. These market sectors are large and fragmented, and we believe they present opportunities for significant growth. We aspire to be the "First Choice" of customers, associates, suppliers and the communities in which we operate. This aspiration drives our relentless focus and is reflected in the customer and market centricity, speed and precision, intense teamwork, process excellence and trusted relationships that define our culture. We believe this aspiration distinguishes us from other distributors and has created value for our shareholders, driven above-market growth and delivered attractive returns on invested capital.

> \*      \*      \*

> For the fiscal year ended January 29, 2017, or fiscal 2016, we:

> • generated $7 billion in Net sales, representing 4.4% growth over the fiscal year ended January 31, 2016, or fiscal 2015;

> • generated Net income of $196 million in fiscal 2016, as compared to a Net income of $1,472 million in fiscal 2015, which included income tax credits of $1,196 million;

> • generated $921 million of Adjusted EBITDA, representing 5.1% growth over fiscal 2015; and

> • generated $532 million of Adjusted net income in fiscal 2016, as compared to $351 million in fiscal 2015.

> \*      \*      \*

> We believe our long-standing customer relationships and competitive advantage stem from our knowledgeable associates, extensive product

21

and service offerings, national footprint, integrated best-in-class technology, broad purchasing scale and strategic supplier relationships. *We believe that our comprehensive supply chain solutions improve the effectiveness and efficiency of our customers' businesses*. Our value-add services include customer training, material and product fabrication, kitting, jobsite delivery, will-call pickup options, as well as onsite managed inventory, online material management and emergency response capabilities. Furthermore, we believe our product application knowledge, comprehensive product assortment, and sourcing expertise allow our customers to perform reliably and give them the tools to enhance profitability.

*     *     *

**Fiscal 2016 compared to fiscal 2015**

*Net Sales*

Net sales increased $72 million, or 2.7%, in fiscal 2016 as compared to fiscal 2015.

The increase in Net sales was primarily due to market growth and growth initiatives. These growth initiatives consist of investments in sales personnel, products, and technology aligned with our customers' multifamily, hospitality, and healthcare industries. *The Net sales increase was partially offset by the impact of suboptimal inventory forecasting, and certain operational and distribution challenges from the second half of fiscal 2015. Management implemented improvements within the supply chain and expects to see improved results beginning with the first quarter of 2017*. In addition, the Net sales increase was partially offset by an unfavorable Canadian exchange rate impact, resulting in a $1 million reduction to Net sales in fiscal 2016.

*Adjusted EBITDA*

Adjusted EBITDA decreased $6 million, or 1.1%, in fiscal 2016 as compared to fiscal 2015.

The decrease was primarily due to increased Selling, general and administrative expenses related to ***expenses incurred for supply chain investments*** and the hiring of additional associates to support the expanding business and future growth.

Adjusted EBITDA as a percentage of Net sales decreased approximately 80 basis points in fiscal 2016 as compared to fiscal 2015. The decrease was primarily driven by an increase in Selling, general and administrative expenses as a percentage of Net sales due to ***expenses incurred for supply chain corrective action***.

43.    The 2016 10-K also discussed the Company's Waterworks segment, emphasizing the importance of this segment to HD Supply's future stability and growth.  The 2016 10-K stated in relevant part:

*Infrastructure*

In the Infrastructure market sector, our Waterworks business unit supports both established infrastructure and new projects by meeting demand for critical supplies and services used to build and maintain water systems. We estimate that this market sector currently represents an addressable market in excess of $11 billion annually with demand in the United States driven primarily by an aging and overburdened national infrastructure and general population growth trends. The broad geographic presence of our Waterworks business unit, through a regionally organized branch distribution network, reduces our exposure to economic factors in any single region. We believe we have the potential to capitalize on a substantial backlog of deferred projects that will need to be addressed in the coming years as a result of our customers delaying much needed upgrades or repairs during the recent economic downturn as well as a continued recovery in the non-residential and residential construction markets.

44.    The 2016 10-K filing included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants DeAngelo and Levitt, each certifying that:

1.    I have reviewed this Annual Report on Form 10-K of HD Supply Holdings, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

   a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting

and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

45.     Statements in the 2016 10-K filed with the SEC on March 14, 2017, were improper when made because the Individual Defendants concealed adverse

facts that they knew and deliberately disregarded, including that: (i) the Company's growth and operating leverage targets for full year 2017 were unattainable; (ii) the operational recovery of the Company's FM supply chain was not progressing as expected and would require substantial additional investment; and (iii) the Company was preparing to sell its Waterworks segment.

46.     That same day, the Individual Defendants caused the Company to host a conference call with analysts and investors to discuss HD Supply's financial results and future prospects.  During the call, Defendant DeAngelo reaffirmed that HD Supply remained "committed to our five growth plays and shareholder promise of 300 basis points of growth in excess of market, 1.5 to 2 times operating leverage and 75% cash conversion."  Specifically, defendant DeAngelo stated:

> Our net debt to adjusted EBITDA ratio has now lowered to 4.1 times, approximately 1 turn away from our targeted leverage of 3 times and down approximately 0.6 turns versus prior year. We performed in line with our expectations in the fourth quarter. ***We delivered growth and solid cash flow conversion as we pivoted into the second phase of our operational recovery of Facilities Maintenance***.

> As we highlight on page 4 of the presentation, we delivered 3% sales growth, 1.2% adjusted EBITDA growth and 63% adjusted net income per diluted share growth in the fourth quarter versus prior year. The team expanded gross margin 60 basis points in the fourth quarter versus prior year, driven by continued category management execution. Our SG&A expense as a percent of sales increased 100 basis points versus prior year as a result of ***ongoing talent infusion across the business and costs associated with our Facilities Maintenance supply chain actions***.

\*     \*     \*

I'd like to highlight some of our business unit execution achievements in 2016 and comment on forward momentum. First, ***I want to give an update on our Facilities Maintenance commercial recovery which continues to make solid progress***. As a reminder, our Facilities Maintenance supply chain interruption began with the under-ordering of inventory in advance of the 2016 spring and summer selling seasons.

Corrective action was taken to adjust ordering in 2016 which resulted in an atypical amount of inventory, primarily long lead import inventory, arriving at our distribution centers during the busy summer selling season. As a result, our distribution center resources were stretched beyond ordinary course capacity and it took until November 2016 to process the inventory into our network and rebalance it throughout the country to perfectly meet our local customer promise.

On our third-quarter call we confirmed that the rebalancing phase was behind us and that we had pivoted into a commercial recovery. ***The three phases of our commercial recovery are progressing as we expected: first, by having product fully available-for-sale when and where the customer needs it; second, as we deliver consistently on our customer promise we execute our growth plays to earn growth in excess of market within our Maintenance business; third, we expect to see our property improvement business return to expected growth given the typical leadtime associated with this execution***.

***We are currently in the second phase of the commercial recovery and are confident in our execution and outlook***. We estimate that there was approximately 200 basis points of sales growth headwind for Facilities Maintenance during the fourth quarter associated with the legacy supply chain interruption and an additional 200 basis points of headwinds associated with property improvement slowdown and the industry-wide government-mandated R-22 phase-out, which is consistent with the commentary and guidance we previously disclosed in December.

We expect this impact to continue in the first quarter of 2017 before we begin to see a return to market outgrowth for the balance of the year. Our February performance at Facilities Maintenance was also in line with our expectations.

***Facilities Maintenance has significant momentum***. I am very proud of the transformational execution the team delivered in 2016 as we executed strategic change to continue to extend and evolve our capabilities.

47.    In response to a series of analyst questions about operating leverage, Defendant Levitt confirmed that the FM segment would have reduced costs in future quarters, which would create operating leverage growth, including "at or above 2 times" operating leverage in the third and fourth quarters, and FM segment growth by mid-single digits in May:

**[Ryan Merkel** *William Blair & Company – Analyst***]**

Thanks. I wanted to start with operating leverage target for the year.

To hit the midpoint you are going to need operating leverage above 2 times for the rest of the year. Evan, you spoke to this a little bit. But I just wanted to clarify, is this what you are expecting for the second quarter to the fourth quarter, op leverage above 2 times?

**[Levitt]**

***For the second quarter we are expecting a normalized operating leverage. So in the 1.5 to 2 times range what we seen historically***.

***And then in the third quarters and fourth quarters we expect we will be at or above 2 times***. And that will get us to the lower end of the 1.5 to 2 times range for the year.

**[Merkel]**

Okay, so you are pointing us to the lower end of that 1.5 to 2 times for this year, the upper end there is really not in the cards?

**[Levitt]**

I wouldn't say it's not in the cards. Right now we are guiding towards the lower end.

**[Merkel]**

Okay. And then ***the pickup in the operating leverage, is that mainly a function of the Facilities Maintenance growth starting to pick back up once you get into the selling season and then the cost falling off in FM?*** Is there anything else to consider?

**[Levitt]**

No, ***you are exactly right, the pickup in the sales, the fall-off of the costs, our comparables year over year get easier***. As Joe asked on the last question it's about $6 million to $10 million improvement in SG&A cost on the back half of the year per quarter.

**[Merkel]**

Okay and then just lastly, ***is it still your expectation that Facilities Maintenance growth can get to mid single digits by May as we start to hit the easier comparisons and the rental cycle picks up?***

**[Levitt]**

***Yes, that's correct***.

48.    Also on the same call, when Defendant DeAngelo was asked specifically about rumors of a sale of the Waterworks segment.  He avoided the question and emphasized HD Supply's current focus on being "a very distant number one in all three of our businesses," as stated in the following exchange:

**[David Manthey *Robert W. Baird & Company – Analyst*]**

First off, regarding the rumors of a Waterworks sale, I'm wondering if you have any comments regarding that possibility or just more generally how you view any other potential portfolio changes over the course of the next several years?

**[DeAngelo]**

We have always had the same spec, David, so all of our businesses need to be leadership businesses with a clear path to distant number one. So we meet the criteria of leadership, we think we've got the right stack of path to be a very distant number one in all three of our businesses.

And we will operate only in North American markets highly fragmented. So I think we are hitting the spec of where we are. Constantly as people approach us we will always evaluate and approach and we will see if that creates value for our associates and value for our shareholders. And that's consistent with what we have done over the last 10 years.

49.    Analysts continued to respond positively to the Individual Defendants' improper statements regarding HD Supply's growth prospects and expected results.  For example, in a Deutsche Bank report issued on March 31, 2017, based on the statements made by the Company's management, HD Supply's shares were given a price target of $48, with Deutsche Bank analysts stating in part:

> *We recently hosted investor meetings with HD Supply management. This report discusses key takeaways from those meetings*.

*      *      *

<u>Outgrowth and margin expansion targets retained</u>

The company was upbeat regarding its prospects for returning to FM segment outgrowth of ~300bps starting towards the end of 2Q17/early 3Q17. Drivers include easy (operational) comparisons, ongoing SKU introductions, previous investment in staff (both front and back office) and ***most importantly a critical boost from more normalized expected results at the key Property Improvement (PI) business as previous supply chain issues fade***.

***HD Supply continues to anticipate FM operating leverage (change in y/y EBITDA over change in y/y sales) to hit ~1.5x by 2Q17 and ~2.0x in the second half*** – driven by easy comparisons and the absence of incremental y/y supply chain costs such as extra freight (expected $5mm this Q, that has already been paid, declining to $1-2mm next Q). The company noted that to secure its FM operating leverage targets, it would need to realize approximately MSD top line growth (so iterative with the previous bullet point).

*     *     *

<u>Targeting 3x financial leverage</u>

***The company believes that roughly 3x leverage (net debt to adjusted EBITDA) to be the appropriate capital structure, which the company expects to achieve (organically) by roughly the end of this year as cash flow is expected to pick up*** due to prior debt restructuring and associated interest cost savings.

**REASONS STATEMENTS WERE IMPROPER**

50.   The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)     the Company's growth and operating leverage targets for full year 2017 were unattainable;

(b)     HD Supply would not meet earnings estimates for the first quarter of 2017;

(c)     the operational recovery of the Company's FM supply chain was not progressing as expected and would require substantial additional investment;

(d)     the Company was preparing to sell its Waterworks segment; and

(e)     as a result of the foregoing, the Company's touted financial and business prospects were materially false and misleading at all relevant times.

## THE INDIVIUAL DEFENDANTS CAUSE HD SUPPLY TO FILE MATERIALLY MISLEADING PROXY STATEMENTS

51.     On March 31, 2017, the Individual Defendants caused HD Supply to file a proxy statement for its 2017 annual meeting of stockholders pursuant to Section 14(a) of the Exchange Act (the "Proxy Statement").  Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any

allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claim.

52.    In the Proxy Statement, Defendants solicited stockholder votes to re-elect Defendants Affeldt and Dorsman to the Board.   The Proxy Statement contained materially misleading statements with respect to this vote.  For instance, the Proxy Statement detailed the following concerning the Board and Audit Committee's role in "risk oversight":

> Our board has overall responsibility for overseeing our risk management. Under its charter, the Audit Committee is responsible for reviewing and discussing the Company's risk management practices, including the effectiveness of the systems and policies for risk assessment and risk management, the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, any unusual material transactions and management, internal auditor and independent auditor reviews of the Company's Foreign Corrupt Practices Act policies, procedures and monitoring. The Audit Committee also oversees our corporate compliance and ethics programs, as well as the internal audit function. The board's other committees oversee risks associated with their respective areas of responsibility. For example, the Compensation Committee oversees the potential risks associated with our compensation policies and practices.

> In addition to the committees' work in overseeing risk management, our full board regularly engages in discussions of the most significant risks that the Company is facing and how these risks are being managed. The board also receives reports on risk management from senior officers of the Company and from the committee chairs. The board reviews periodic assessments from the Company's ongoing enterprise risk management process that are designed to identify

potential events that may affect the achievement of the Company's objectives.

The Company's general counsel reports directly to our chief executive officer, providing him with visibility into the Company's risk profile. The Company's internal audit staff regularly reports to the Audit Committee, and our general counsel and our vice president of internal audit, have regularly scheduled private sessions with the Audit Committee. The board of directors believes that the work undertaken by the committees of the board, together with the work of the full board of directors and our chief executive officer, enables the board of directors to oversee effectively the Company's risk management function.

53.     The statements above are misleading because they declare that the Board would exercise "oversight" over "the most significant risks that the Company is facing."  Such major risks would include the operations of the FM Supply Chain and selling the Waterworks segment, as well as risk from securities law violations.  However, the Board did not exercise any risk oversight when it allowed several of the Company's fiduciaries to make improper statements about the Company's financials in various public filings and press releases concerning these subjects.

54.     The misleading statements in the Proxy Statement were the essential link to the directors' reelection.

## THE TRUTH BEGINS TO EMERGE

55.     On June 6, 2017, the truth about the Company's operations and financial prospects began to emerge.  On that date, the Company issued a press release announcing the Company's first quarter 2017 financial results, reporting earnings per share of $0.63, $0.03 less than analysts' estimates.  The press release also reported the sale of the Company's Waterworks segment, stating:

> Today, HD Supply announced it has entered into a definitive agreement to sell HD Supply Waterworks, the nation's largest distributor of water, sewer, storm and fire protection products, to Clayton, Dubilier & Rice. The purchase price is approximately $2.5 billion payable in cash at closing. The transaction is expected to close in HD Supply's third quarter of fiscal 2017 subject to customary closing conditions, including applicable regulatory approvals.

56.     On the same day, HD Supply held a conference call.  During the call, Defendant DeAngelo discussed the Company's disappointing results and the sale of the Waterworks segment.  He also explained that the Company's FM segment was experiencing significant obstacles and would require substantial additional investment.  The conference call included the following statements by Defendant DeAngelo:

> This morning, we announced a significant transaction for HD Supply. After robust strategic review and marketing process, we've entered into a definitive agreement to sell the HD Supply Waterworks business unit to Clayton, Dubilier & Rice, a leading global private equity investment firm. The transaction value is approximately $2.5 billion to be paid in cash at closing. We expect the transaction to

35

close in our fiscal third quarter, subject to customary closing conditions and including the receipt of required regulatory approvals.

This is a transformational transaction for HD Supply. The transaction represents a unique moment in time for our company as we transition from a levered company and pivot to our next-generation execution road map. I will share a bit more perspective on the transaction.

The deal simplifies our business and focuses on our highest value-creation opportunities. Facilities Maintenance will now represent approximately 75% of total HD Supply adjusted EBITDA, an increase of approximately 20 percentage points.

\*       \*       \*

Our first quarter sales performance was in line with expectations overall, but our earnings contribution was below our expectations. The underperformance was largely driven by temporary margin compression at Waterworks associated with PVC commodity fluctuations and overall HD Supply business mix.

Specifically, Waterworks and Construction & Industrial outgrew Facilities Maintenance. *Facilities Maintenance sales were below our expectations in the first quarter*. As we look forward, we continue to feel comfortable with our sales growth outlook but are executing to offset gross margin headwinds.

As I mentioned, *we're also planning for accelerated expense investment*. Together, we believe it appropriate to revise our forward outlook. Gross margin at Facilities Maintenance is vertical and product-mix related, and at Construction & Industrial, we have seen a change in the rebar market that is adding pressure to gross margin performance.

57.   The market responded negatively to these revelations, resulting in a

substantial sell-off of HD Supply stock.  Indeed, on June 6, 2017, the Company's

share price fell $7.24 to close at $34.03 per share, a decline of 17.5%, erasing over

$1.4 billion in market capitalization in one day. HD Supply's share price continued to fall the next day on unusually high trading volume, dropping an additional $1.22 per share, or 4%, to close at $32.81 per share on June 7, 2017—a two-day drop of over 20%.

58.     Analysts have responded to the disclosures by downgrading the ratings on the Company's stock due to its failure to meet growth expectations, the unexpected sale of the Waterworks segment, the ongoing capital investment demands, and HD Supply management's lack of credibility. As explained in a June 9, 2017 report from Deutsche Bank Markets Research, which downgraded the Company's stock rating to Hold with a price target of only $33:

> ***We believe that HD Supply management credibility has now become an impediment to a sustained higher share price***. The company missed 1Q17 consensus targets and lowered the year after last year's misses and repeatedly professed high confidence in the company's profit trajectory and associated contribution leverage. Instead, HD Supply took down its profit leverage targets while simultaneously called out a sizeable ramp in Facilities Maintenance investment spending for which details and magnitude were not articulated.

> Overall, ***it is unclear when the new elevated spending might subside, and could instead go on for years***. The investment spending could also take the form of price cuts (to regain lost businesses, for instance), in our view, on top of continued management hiring. The company may additionally have to spend to reorganize its sales organization, and to upgrade its systems which could prove to be a long term and expensive proposition. We also anticipate the operations streamlining (44 DCs to be potentially reduced by half) to take a long time while incurring sizeable associated cost.

59.    Due to HD Supply's ongoing operational issues and failure to meet growth expectations, the Company's stock price has continued to decline, closing at only $29.46 per share on July 12, 2017.

## INSIDER SELLING

60.    Not all stockholders were harmed by the Individual Defendants' actions.  Indeed, during the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their holdings of HD Supply stock at bloated prices.  Specifically, the Insider Selling Defendants (including Defendants DeAngelo and Atkins) took advantage of the artificially inflated prices to sell their HD Supply shares for substantial proceeds.  As detailed below, these Insider Selling Defendants sold **more than $53.6 million** of personally held common stock.

61.    Defendant DeAngelo is HD Supply's CEO, President, and the current Chairman of the Board.  DeAngelo was aware of material, non-public information regarding the inaccuracy of the Company's statements in press releases and public filings, as well as those made by other senior executives at HD Supply.  While in possession of this information, between March 29, 2017, and April 4, 2017, DeAngelo sold at least 1.3 million personally held shares of HD Supply stock at artificially inflated prices ($40.27-$41.28 per share) for proceeds of approximately

$53,498,906.    DeAngelo's sales were timed to maximize profits from the Company's then-artificially inflated stock price.

62.    Defendant Atkins is currently a member of the Board.   During the Relevant Period, Atkins was aware of material, non-public information regarding the inaccuracy of the statements made by senior executives at HD Supply and the Company's statements in its press releases and public filings.   While in possession of this information, on March 30, 2017, Atkins sold at least 3,096 personally held shares of HD Supply stock at artificially inflated prices for proceeds of approximately $125,388.   Atkins's sales were timed to maximize profits from the Company's then-artificially inflated stock price.

63.    The foregoing insider sales, which resulted in total proceeds of **more than $53.6 million**, are summarized in the following chart.   These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein.

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| DeAngelo | March 29, 2017 | 300,000 | $40.3851 | $12,115,530.00 |
|  | March 30, 2017 | 300,000 | $41.0869 | $12,326,070.00 |
|  | March 31, 2017 | 300,000 | $41.2813 | $12,384,390.00 |
|  | April 3, 2017 | 300,000 | $40.5232 | $12,156,960.00 |
|  | April 4, 2017 | 112,145 | $40.2689 | $4,515,955.79 |
|  | **TOTAL** | **1,312,145** |  | **$53,498,905.79** |
| Atkins | March 30, 2017 | 3,096 | $40.50 | $125,388.00 |
|  | **TOTAL** | **3,096** |  | **$125,388.00** |
| **TOTAL INSIDER SALES** |  |  |  | **$53,624,293.79** |

## FIDUCIARY DUTIES

64.    By reason of their positions as officers, directors, and/or fiduciaries of HD Supply, and because of their ability to control the business and corporate affairs of HD Supply, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage HD Supply in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of HD Supply and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

65.    Each director and officer of the Company owed, and owes, to HD Supply and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

66.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

67.    In addition to these duties, the members of the Audit Committee owed specific duties to HD Supply, under the Audit Committee's Charter, to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

68.    According to HD Supply's Audit Committee Charter, the function of the committee is oversight, and the primary purposes of the Audit Committee are to (1) prepare the committee's report included in the annual proxy statement, and (2) to assist the Board in overseeing and monitoring matters relating to:

- the Company's accounting and financial reporting policies, practices and processes;

- the quality and integrity of the Company's financial statements;

- the effectiveness of the Company's internal control over financial reporting;

- the Company's compliance with legal and regulatory requirements;

- the qualifications, independence, and performance of the Company's independent auditor; and

- the capabilities, resources, and performance of the Company's internal audit function.

69.    Specifically, according to HD Supply's Audit Committee Charter, the

Audit Committee's responsibilities include the following:

- *Review of Audit Results*. The Committee shall review and discuss with the independent auditor (a) the report of their annual audit, or proposed report of their annual audit; (b) material written communications between the independent auditor and management, such as any management letter or internal control letter issued or proposed to be issued, or schedule of unadjusted differences; (c) the reports of their reviews of the Company's interim financial statements conducted in accordance with Statement on Auditing Standards No. 100 and (d) the reports of the results of such other examinations outside of the course of the independent auditor's normal audit procedures that the independent auditor may from time to time undertake. The Committee shall review and discuss with management, the internal auditors and the independent auditor, as appropriate (a) all matters required to be communicated to the Committee under GAAP; (b) significant issues regarding accounting and auditing principles and practices and financial statement presentations, including all critical accounting policies and estimates, any significant changes in the Company's selection or application of accounting or auditing principles and any significant issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (c) analyses prepared by management or the independent auditor setting forth significant financial reporting

issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements and the treatment preferred by the independent auditor; (d) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures; (e) all significant valuation allowances and liabilities, restructuring, and other reserves; and (f) the reports required by Section 204 of the Sarbanes-Oxley Act and all rules promulgated thereunder by the SEC. On a regular basis, the Committee shall meet separately with the independent auditor and/or internal auditors to discuss any matters that the Committee, independent auditor, and/or internal audit director believe should be discussed privately.

- *Review of Financial Statements and Disclosures*. The Committee shall meet to review and discuss with financial management and the independent auditor prior to issuance drafts of the Company's annual audited financial statements and quarterly financial statements including (a) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's reviews of the quarterly financial results; and (b) in the event that the Company publishes one, the "Report of Management" in the Annual Report to Shareholders. The Committee shall also (a) consider whether such financial statements are complete, consistent with information known to Committee members, and reflect appropriate accounting principles; and (b) recommend to the Board whether the annual audited financial statements and quarterly financial statements should be included in the Company's Form 10-K or Form 10-Q, respectively. The Committee shall prepare, review and approve the "Report of Audit Committee" and its inclusion in any other document, including in the Annual Report to Shareholders and in the annual proxy statement.

- *Review of Financial Press Releases*. The Committee shall review and discuss earnings and other financial press releases

(including any use of "pro forma" or "adjusted" non-GAAP information), as well as any financial information and earnings guidance provided to any third parties including analysts, lenders and rating agencies (which review may occur before or after issuance and, as appropriate, may include a review of the types or substance of information to be disclosed and the form of presentation to be made).

- *Oversight of Internal Audit Function*. The Committee shall (a) review the appointment, replacement or dismissal of senior internal audit personnel; (b) review with management and senior internal audit personnel the charter, plans, activities, staffing, budget, compensation and organizational structure of the internal audit function; (c) review all significant reports to management prepared by internal audit personnel and management's responses thereto; and (d) review any restrictions on the scope of the internal audit department's activities or access to information.

- *Review and Discuss the Systems of Internal Accounting Controls*. The Committee shall review with management, the internal auditors, and the independent auditor, as appropriate, significant findings and recommendations with respect to (a) the adequacy of the Company's internal accounting controls; (b) the Company's financial, auditing, and accounting organizations and personnel; (c) internal control related reports and procedures, including (i) management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Sections 302 and 404 of the Sarbanes-Oxley Act, and (ii) the procedures undertaken by the Chief Executive Officer and Chief Financial Officer in connection with their certifications contained in the Company's periodic reports, including their evaluation of the Company's disclosure controls and procedures and internal control over financial reporting.

- *Establish Procedures for Complaints Regarding Financial Statements and Accounting Policies*. The Committee shall establish procedures for (a) the receipt, retention and treatment

of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. The Committee shall receive reports from management on disposition of such concerns and complaints. The Committee shall also review with management and the independent auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies.

- *Review and Discuss Risk Management Practices.* The Committee shall review (a) the effectiveness of the system and policies for risk assessment and risk management, including the risk of fraud; (b) the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures; (c) any unusual material transactions; and (d) management, internal auditor and independent auditor reviews of the Company's Foreign Corrupt Practices Act policies, procedures and monitoring.

- *Review and Discuss Conformity with Legal and Business Conduct Requirements.* The Committee shall review, at least annually, the implementation and effectiveness of the Company's compliance and ethics program. The Company shall periodically review with the Company's general counsel (i) any legal matter that could have a significant impact on the Company's financial statements and (ii) any material reports, notices or inquiries received by the Company from regulators or governmental agencies. The Committee shall receive regular updates from management and the Company's legal counsel regarding compliance matters. On an annual basis the Committee shall review the Company's Code of Business Conduct and Ethics to ensure that it is adequate and up-to-date.

- *Self-Evaluation.* Conduct an annual self-evaluation of the Committee's performance, comparing the performance of the

45

Committee with the requirements of this Charter, and set forth the goals and objectives of the Committee for the upcoming year. The Committee shall conduct such performance evaluation, and report the results to the Board, in such manner as the Committee deems appropriate.

- *Reports to the Board.* The Committee shall report regularly to the Board on all matters charged to the responsibility of the Committee, including, without limitation, any issues that arise with respect to: (i) the quality or integrity of the Company's financial statements; (ii) the performance and independence of the Company's independent auditor; (iii) the performance of the Company's internal audit function; and (iv) the Company's compliance with legal and regulatory requirements.

- *Charter Review.* At least annually, review and assess the adequacy of this Charter and recommend to the Board for approval any changes that the Committee believes are appropriate.

- *Other Powers and Duties*. Exercise such other powers and perform such other duties and responsibilities as are incidental to the purposes, duties and responsibilities specified herein or as may from time to time be delegated to the Committee.

70.   Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

71.   Additionally, the Individual Defendants, as officers and/or directors of HD Supply, are bound by the Company's Code of Business Conduct and Ethics

(the "Code") which, according to the Code, "broadly outlines the obligations for the ethical conduct inherent in employment with, and service to, the Company and at the same time reinforces our core values," among other things.  HD Supply's associates, officers, and directors must follow the Code.

72.    According to the Code:

**Maintaining Books and Records**

Accurate financial reporting is a core aspect of how we conduct business. Our goal at HD Supply is, and will always be, accounting transparency and accuracy. To meet this standard, we consider it essential to maintain detailed, accurate books, records, and accounts to accurately reflect our transactions and to provide full, fair, accurate, timely, and understandable disclosure in reports and documents that we file, or may file, with or submit to the Securities and Exchange Commission, any applicable exchange, any governmental agency, or in any other public communications. To ensure that we provide true, accurate and complete information, we maintain a system of internal accounting controls to reinforce and verify our own compliance with these policies. Associates must always stay in full compliance with any system of internal controls that is communicated by the CEO, CFO, General Counsel, Finance Department, or any department head, or that is generally communicated through the Company's intranet site.

*        *        *

**Securities Laws and Insider Trading**

The U.S. federal securities laws and rules promulgated thereunder prohibit any person that is aware of material, non-public information from purchasing or selling securities and from communicating such information to any other person for such use. "<u>Material</u>" information is generally any information that a reasonable investor would likely consider important in deciding whether to buy, sell or hold securities,

including without limitation sales and earnings figures, information about major contracts, stock splits, acquisitions or mergers, extraordinary management developments, changes in securities ratings by ratings agencies, significant transactions, the sale of an affiliated company, the commencement of significant litigation, important new projects, or significant adverse events. It is the Company's policy that its Associates may not purchase or sell securities issued by the Company (including, without limitation, any subsidiary or affiliate of the Company and any company with which the Company has or is pursuing a commercial relationship) while aware of material, non-public information concerning our Company, its subsidiaries or affiliates, or such other company, as the case may be. In order to assist with compliance with laws against insider trading, the Company has adopted an insider trading policy which has been distributed to Associates. The penalties for illegal insider trading, along with other violations of the U.S. securities laws, are severe. If Associates have any questions on securities law matters or the insider trading policy, please contact the Legal Department.

*       *       *

## Compliance with Laws, Rules and Regulations

HD Supply takes its responsibilities to comply with all laws, rules and regulations affecting the Company's business and its conduct in business matters very seriously. All Associates are expected to respect and obey the laws of the cities, states and countries in which the Company operates. Associates must take the time to familiarize themselves with the laws and regulations that apply to their respective work responsibilities. Our stellar reputation is the foundation of our present and future success, and earning and maintaining that reputation requires attention and effort to stay in compliance with the law. Any violation of applicable law may subject the violating individual to disciplinary action, up to and including termination of employment, in addition to whatever possible civil and/or criminal liability may be incurred by such violation. Associates with any questions concerning whether the Company or any of its Associates

are in compliance with U.S. or foreign laws, rules or regulations must address their concerns with the Legal Department.

\*        \*        \*

## Communications and Public Affairs

Information disseminated about the Company must be both accurate and consistent. For this reason, the Communications department is responsible for the Company's internal and external communications. This department is responsible for all marketing and advertising activities and communications with the media, local communities and government officials in both routine and non-routine situations, and for all Company-wide communications with our Associates.

73.     Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

## Control, Access, and Authority

74.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of HD Supply, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by HD Supply.

75.     Because of their advisory, executive, managerial, and directorial positions with HD Supply, each of the Individual Defendants had access to

adverse, non-public information about the financial condition, operations, and improper representations of HD Supply.

76.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of HD Supply, and was at all times acting within the course and scope of such agency.

**Reasonable And Prudent Supervision**

77.    To discharge their duties, the officers and directors of HD Supply were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of HD Supply were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how HD Supply conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that HD Supply was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

78.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owes, and owed, to HD Supply and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of HD Supply, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of HD Supply, the absence of good faith on his or her part, and a reckless disregard for their duties to HD Supply and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to HD Supply.

79.     The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

80.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.   As a result, HD Supply has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of

their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

83.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

84.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the

conspiracy, common enterprise, and/or common course of conduct complained of herein.

85.    Each of the Individual Defendants aided and abetted, and rendered substantial assistance in, the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### DAMAGES TO HD SUPPLY

86.    As a result of the Individual Defendants' wrongful conduct, HD Supply disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated HD Supply's credibility.  HD Supply has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

87.    As a direct and proximate result of the Individual Defendants' actions as alleged above, HD Supply's market capitalization has been substantially damaged, having lost hundreds of millions of dollars in value as a result of the conduct described herein.

88.     Further, as a direct and proximate result of the Individual Defendants' conduct, HD Supply has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending HD Supply and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)     costs incurred by the Company in connection with the SEC investigation into its public disclosures;

(c)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on HD Supply's artificially-inflated stock price; and

(d)     costs incurred from the loss of the Company's customers' confidence in HD Supply's products.

89.     Moreover, these actions have irreparably damaged HD Supply's corporate image and goodwill.  For at least the foreseeable future, HD Supply will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that HD Supply's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.    Plaintiff brings this action derivatively in the right and for the benefit of HD Supply to redress injuries suffered, and to be suffered, by HD Supply as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  HD Supply is named as a nominal defendant solely in a derivative capacity.

91.    Plaintiff will adequately and fairly represent the interests of HD Supply in enforcing and prosecuting its rights.

92.    Plaintiff was a shareholder of HD Supply common stock at the time of the wrongdoing of which Plaintiff complains, and has been continuously since.

93.    Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

94.    The Board is comprised of the following nine (9) directors: DeAngelo, Affeldt, Atkins, Dorsman, McNamee, Peffer, Rubright, Wolfe, and non-defendant Nowell.  A majority of these directors are not disinterested and independent with respect to the acts and omissions alleged herein.  Notably, at least half of the current board faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable

inquiry, supervision, and due care described herein.  Where a plaintiff alleges that at least half of the members of the current board are not independent or disinterested, demand is excused as futile.

**Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

95.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such, had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

96.    Indeed, Director Defendants DeAngelo, Affeldt, Atkins, Dorsman, McNamee, Peffer, Rubright, and Wolfe each signed the improper 2016 10-K.  The 2016 10-K was improper because, *inter alia*, it misrepresented and/or failed to disclose that: (a) the Company's stated growth and operating leverage targets were unattainable; (b) the operational recovery of the Company's FM supply chain was not progressing as expected and would require substantial additional investment; and (c) the Company was preparing to sell its Waterworks segment. As a result, the Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, rendering demand upon them futile.

97.     Moreover, the Director Defendants as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

98.     The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

99.   The Director Defendants' making or authorization of false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of HD Supply to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

100.   As alleged above, Defendants Affeldt, Atkins, Dorsman, McNamee, Peffer, Rubright, and Wolfe violated Section 14(a) of the Exchange Act by negligently making the misstatements and omissions in the Proxy Statement, as detailed above.

**Demand is Futile as to the Audit Committee Defendants**

101.  The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing HD Supply's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants, therefore, is futile.

102.  Defendants McNamee, Peffer, Rubright, and Wolfe each served on the Audit Committee at some time during the Relevant Period.  Therefore, at least half of the current Board faces a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith due to their failure to meet

their obligations as members of the Audit Committee.  Since each of these Board members is therefore not independent or disinterested, demand is excused as futile.

**Demand is Futile as to Defendant DeAngelo for Additional Reasons**

103.  Demand is also futile as to Defendant DeAngelo because, as the Company admits, DeAngelo does not meet the standards for director independence.

104.  Defendant DeAngelo is currently employed at HD Supply as CEO, President, and Chairman, and as such, derives a substantial portion of his income from employment with HD Supply.  DeAngelo received $5,305,241 in total compensation from HD Supply in 2016, which does not include the lucrative stock options and performance-based restricted stock units that are granted to DeAngelo as part of his employment compensation package.  Because DeAngelo has financially benefitted from the wrongdoing of the Individual Defendants, and because his livelihood continues to depend on his ongoing employment with HD Supply, he is not independent and not disinterested.  Demand is therefore futile as to DeAngelo.

**Demand is Futile Based on Insider Selling as to Defendants DeAngelo and Atkins**

105.  Demand is futile as to Defendants DeAngelo and Atkins because, as alleged herein, each engaged in insider trading activity at a time when each of them

knew of adverse, material, and non-public information about the Company's financial outlook that was not being disclosed to the shareholders.

106.   On the basis of this non-public information, DeAngelo and Atkins timed their sales to maximize profit from HD Supply's then-artificially inflated stock price.   As a result of their illicit insider sales, DeAngelo and Atkins each received direct financial benefits not shared with HD Supply shareholders, and are, therefore, each directly interested in a demand.   DeAngelo alone reaped more than $53 million in proceeds from the sale of his personal stock holdings.   Further, defendants DeAngelo and Atkins each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.   As such, demand upon DeAngelo and Atkins is futile.

107.   Plaintiff has not made any demand on shareholders of HD Supply to institute this action since such demand would be a futile and useless act for the following additional reasons:

(a)    HD Supply is a publicly traded company with over 200 million shares and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of HD Supply shareholders; and

(c)     making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, even assuming all shareholders could be individually identified  with any degree of certainty.

## COUNT I

### Against the Individual Defendants for Violations of
### Section 14(a) of The Securities Exchange Act of 1934

108.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.   Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claim.

110.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, **in contravention of such rules and regulations as the [SEC] may prescribe** as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

111.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

112.   The Company's Proxy Statement violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that: (i) the Company's growth and operating leverage targets for full year 2017 were unattainable; (ii) the operational recovery of the Company's FM supply chain was not progressing as expected and would require substantial additional investment; (iii) the Company was preparing to sell its Waterworks segment; and (iv) as a result of the foregoing, HD Supply's public statements were materially false and misleading at all relevant times.

113.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditor.

114.   The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxy Statement.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

115.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.   The Individual Defendants owed, and owe, HD Supply fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed, and owe, HD Supply the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

117.   The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

118.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

119.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, HD Supply has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

120.   Plaintiff, on behalf of HD Supply, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

121.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of HD Supply.

123.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to HD Supply.

124.   Plaintiff, as a shareholder and representative of HD Supply, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

125.   Plaintiff, on behalf of HD Supply, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

126.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

128.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers;

(ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

129.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

130.   Plaintiff, on behalf of HD Supply, has no adequate remedy at law.

## COUNT V

### Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information

131.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.   At the time the Insider Selling Defendants sold their HD Supply stock, they knew the information described above, and sold HD Supply stock on the basis of such information.

133.   The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold HD Supply stock.

134.   The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

135.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

136.   Plaintiff, on behalf of HD Supply, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' violations of federal law, breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and insider selling;

B.   Directing HD Supply to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HD Supply and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to

place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of HD Supply's directors, executives and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of HD Supply to nominate at least three candidates for election to the Board to replace existing directors;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.     Awarding to HD Supply restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

70

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 8, 2017          **JOHNSON & WEAVER, LLP**

By:  *s/ Michael I. Fistel*
     Michael I. Fistel, Jr.
     michaelf@johnsonandweaver.com
     Georgia Bar No.: 262062
     William W. Stone
     williams@johnsonandweaver.com
     Georgia Bar No.: 273907
     David A. Weisz
     davidw@johnsonandweaver.com
     Georgia Bar No.: 134527
     40 Powder Springs Street
     Marietta, GA 30064
     Telephone: (770) 200-3104
     Facsimile: (770) 200-3101

     *Attorneys for Plaintiff Sean Zhou*

# **VERIFICATION**

I, Sean Zhou, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  July 26, 2017

DocuSign by:

_____
552D2A5DA2FA44B...

(Signature of Sean Zhou)